**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| Sherry A. Bullock, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | )   Civil Action No:  3-11-cv-00036-HEH |
| | ) |
| Kraft Foods, Inc., | ) |
| | ) |
| *Defendant*. | ) |

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant, Kraft Foods Global, Inc. (incorrectly identified as "Kraft Foods, Inc.") ("Defendant" or "Kraft"), submits its Brief in Support of its Motion for Summary Judgment.

## I.      INTRODUCTION

During the second day of the deposition of Plaintiff Sherry Bullock (hereinafter, Plaintiff or "Bullock"), Bullock made the following, critical admission:

1  Q.  Please answer my question.

2  There came a point prior to your

3  termination from Kraft where you, um, were

4  missing work and you did not have FMLA-covered

5  days left to cover those absences; is that

6  correct?

7      A.  Yes.

[Appendix 1: Deposition of Sherry Bullock ("Dep."), Vol. II, p. 132:1 – 7].[1]

Bullock further admitted that since August 11, 2008, she was absent from work – every day – through the date of her termination on November 21, 2008.

> 19   Q.   Okay.  Just at the core, being present
>
> 20   work for whatever reason you -- you weren't
>
> 21   present, you were not present at work at any
>
> 22   time after August 11th; is that right?
>
> 23      A.   That's right.

[Dep., Vol. II, p. 134:19 – 23].

Through this testimony, Bullock admitted the very reason that Kraft terminated her employment on November 21, 2008, to wit: that she had exceeded her allowable use of days to be absent from work under the Family and Medical Leave Act ("FMLA"), which she had taken on an intermittent basis over the prior twelve-month period, and as a result, had repeatedly violated the company's attendance policy because she continued to be absent from work without excuse.

These undisputed facts are dispositive of this case and warrant the granting of summary judgment in Kraft's favor.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.   Identification of the Parties**

Kraft manufactures and sells food products around the world.  It operates a bakery facility in Richmond, Virginia, where it employs approximately five hundred sixty-five (565)

---

[1] Plaintiff's deposition was completed on September 7, 2011.  At the time of this filing, only a draft of the deposition transcript is available, and Appendix 1 consists of pages from that draft transcript.

people.  The Richmond Bakery produces Oreos, Wheat Thins, and other well-known products.
[Appendix 2: Affidavit of Tom Carlyle ("Carlyle Aff.") at ¶ 3].  At all times relevant to this
lawsuit, Tom Carlyle was the Human Resources Manager of the Richmond Bakery.  [*Id.* at ¶ 2].
Holly Wilson worked as a nurse at the Richmond Bakery, and Sherri Palmer served as the
Bakery's FMLA Coordinator.[2] [App. 3: Affidavit of Holly Wilson ("Wilson Aff.") at ¶ 2; App.
4: Affidavit of Sherri Palmer Manzel ("Palmer Aff.") at ¶ 2].

Bullock has worked at the Richmond Bakery since 1991.  [Docket No. 23: Amended
Complaint ("Am.Comp.") at ¶¶ 4, 11].  Bullock is African-American.  [Dep., Vol. II, p. 37].
Throughout her employment, Bullock and all other hourly employees at the Richmond Bakery
were represented by Local 358 of the Bakery, Confectionary, Tobacco Workers and Grain
Millers International Union, AFL-CIO ("Union").  [Carlyle Aff. at ¶ 7].  As such, the terms of
Bullock's employment were controlled by a series of agreements between the Union and Kraft.
[*Id.* at ¶ 7 and Atts. A and B thereto].

**B.     Relevant Policies**

1.     Attendance Program

At all times relevant to the instant lawsuit, Kraft maintained an Attendance Program that
governed how Kraft would treat absences by Union members.  [Carlyle Aff. at ¶ 8 and Att. C].
Under the Attendance Program, employees were assigned "points" or "incidents" when they had
unexcused absences from work.  [Wilson Aff. at ¶ 6 and Att. A thereto].  For example, any
absence up to four (4) days resulted in one point for each day missed; an unexcused absence on
the last scheduled day  before a holiday or the next scheduled day after a holiday resulted in two

---

[2] Since the events of this lawsuit, Sherri Palmer has hanged her last name to Manzel.  To
avoid confusion, she is referred as Sherri Palmer throughout this Brief.

points per absence; and a failure to report an absence within prescribed timeframes resulted in two points.  [*Id.*].  There were certain exceptions to this point scheme.  Relevant to this lawsuit, absences taken pursuant to an approved FMLA leave did not result in attendance points.  [*Id.* at ¶ 7].  In addition, even if they did not qualify for FMLA leave, employees could have one multiple-day absence due to illness per six-month period without incurring a point—assuming the employee submitted acceptable documentation from a physician (this was sometimes referred to as the "Short Note" exception).  [*Id.*].  Finally, one consecutive absence of ten (10) scheduled days or more per rolling six month period was not counted under the Attendance Program even in the absence of an approved FMLA leave—again, assuming the employee submitted acceptable documentation from a physician (this was sometimes referred to as the "Long Note" exception).  [*Id.*].

If an employee accumulated six (6) points in a six (6) month period, he or she was placed at Step I of Kraft's Attendance Program, which was a written warning and a three-month attendance probationary period.  [*Id.* at ¶ 9].  During that probationary period, the only excusable absences were approved FMLA leave, vacation, holidays (unless scheduled to work), death in the family, jury duty, military leave, and Union business.  [*Id.*].  Any other absence during the probationary period automatically advanced the employee to Step II discipline under the Attendance Program, which was a one-week unpaid suspension and a four-month probationary period.  [*Id.*].  That is, when an employee was on probation, he or she lost the benefit of the "Short Note" and "Long Note" exceptions.  [*Id.*].  Once the employee had been advanced to Step II, any unexcused absence in the probationary period automatically resulted in the employee being advanced to Step III discipline under the Attendance Program—suspension pending termination of employment.  [*Id.*].

2.      <u>FMLA Policy</u>

At all times relevant to the instant lawsuit, Kraft also maintained an FMLA policy. [Carlyle Aff. at ¶ 12].  Pursuant to federal law, eligible Kraft employees were entitled to twelve (12) weeks of unpaid leave per leave year for absences due to "serious health conditions," as defined by the FMLA.  [*Id.*].  Prior to 2007, Kraft used the calendar year as its leave year, and employees were entitled to 12 weeks of FMLA leave per calendar year.  [*Id.* at ¶ 13].  As of January 1, 2007, Kraft began utilizing the "rolling backward" leave year.  [*Id.* at ¶ 14 and Att. D].  Subsequent to that change, to determine whether an employee was entitled to FMLA leave for any given absence, then, Kraft looked back 12 months from the absence and calculated the amount of FMLA leave taken.  [*Id.* at ¶ 15 and Att. E].  If the employee had used 12 weeks of FMLA leave in the previous 12 months, then he or she would not be entitled to FMLA leave, and the absence would be treated under Kraft's Attendance Program.  [*Id.*].  If an employee was absent for a reason that qualified both as FMLA leave and leave under Kraft's short-term disability ("STD") policy, the FMLA leave ran concurrently with the STD leave, if the employee was eligible for FMLA leave.  [*Id.* at ¶ 16 and Att. E].  Likewise, FMLA leave ran concurrently with approved worker's compensation absences.  [*Id.*]. Thus, when determining whether an employee had used his or her entire 12 weeks of FMLA leave, Kraft counted FMLA leave, STD leave, and worker's compensation leave.  [*Id.*].

3.      <u>Absence-Reporting System</u>

During Bullock's employment, Kraft used a computerized phone system—referred to as the IVR system—for its employees to report absences from work.  [Carlyle Aff. at ¶ 19].  Prior to 2007, employees could use the IVR system to self-report FMLA and worker's compensation absences.  [*Id.*].  This caused problems with FMLA and worker's compensation administration

because employees might report an absence as being FMLA- or worker's compensation-qualifying when it, in fact, was not. [*Id.*].   Beginning in 2007, Kraft's IVR system no longer gave employees the option to self-report absences as being FMLA or worker's compensation. [*Id.*].   Instead, Kraft asked employees to coordinate with its FMLA coordinator, Sherri Palmer, so that she could determine whether an absence might potentially be counted as FMLA or worker's compensation leave and help the employee to complete any required paperwork for the leave. [*Id.*].

4.   Short-Term Disability Leave

During Bullock's employment, Kraft offered short-term disability ("STD") leave to its employees.   If days missed under an approved STD leave were not otherwise excused by the Attendance Program (such as being excused as an approved FMLA absence or under a "Long Note"), then they were not excused under the Attendance Program and were treated like any other unexcused absence for purposes of discipline. [Carlyle Aff. at ¶ 17].

C.   **Background**

Bullock requested and used FMLA leave regularly from at least 2006 until the time of her termination [Wilson Aff. at ¶ 4].   Relevant to this lawsuit, from October 2007 through October 2008 Bullock regularly missed work and requested FMLA leave to cover those absences. [Palmer Aff. at ¶ 6].

Bullock filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging race discrimination, disability discrimination, and retaliation, on November 20, 2006.   [Docket No. 33-2: Bullock's Responses to Requests for Admission ("RFA Resp.") Nos. 1-3; Docket No. 33-1: Requests for Admission ("RFAs") Nos. 1-3 and Ex. A].   The EEOC dismissed the Charge on December 31, 2007.   [RFA Resp. Nos. 4-6; RFA Nos.

4-6 and Ex.B]. Bullock filed another EEOC Charge soon thereafter, on March 28, 2008. [RFA

Resp. Nos. 7-9; RFA Nos. 7-9 and Ex. C].  This Charge alleged race discrimination, disability

discrimination, and retaliation.  [*Id.*].  The EEOC dismissed this Charge on October 5, 2009.

[RFA Resp. Nos. 10-12; RFA Nos. 10-12 and Ex. D].

**D.     Absences Leading to Bullock's Termination**

1.     July 2008 Step I Attendance Discipline

Bullock requested FMLA leave to a cover a significant number of absences between July

2007 and July 2008.  In that time period, Bullock was absent from work and requested FMLA

leave for the following days:

- July 19, 20, and 27, 2007
- August 3, 8, 9, and 10, 2007
- September 24 and 25, 2007
- October 2 and 29, 2007
- November 7, 8, 12, 13, 14, 15, 16, 27, 28, 29, and 30, 2007
- December 3, 4, 7, 11, and 21, 2007
- January 7, 9, 10, 11, 14, 15, 30 and 31, 2008
- February 1, 8, and 29, 2008
- March 13, 14, and 20, 2008
- April 1, 14, 15, 16, and 17, 2008
- May 12, 13, 14, 15, 16, 27, and 30, 2008
- June 2, 3, 4, 6, 26, and 27, 2008
- July 14, 15, 16, 17, 18, 22, 23, 25, 28, 29, 30, and 31, 2008

[Palmer Aff. at ¶ 6 and Att. A].

As is evident from the above list, Bullock exhausted her FMLA entitlement multiple times in

2008, resulting in some of her absences being unexcused.  [*Id.*; Wilson Aff. at ¶ 36].  As of July

31, 2008, Kraft's records showed that Bullock had accumulated more than six (6) attendance

points in the previous six (6) months, so Kraft issued Bullock Step I discipline under its

Attendance Program and placed her on three (3) months of attendance probation.  [Carlyle Aff.

at ¶ 39 and Att. O].  Kraft served Bullock with this discipline on July 31, 2008.  [*Id.*].

2.    <u>August and September 2008 Absences</u>

Bullock also missed work and claimed FMLA leave for August 3, 4, and 5, 2008. [Palmer Aff. at ¶ 6 and Att. A].  Bullock worked on August 10, 2008. [*Id.*].  This was her last day of work at Kraft prior to her termination on November 21, 2008.  [*Id.*; RFA Resp. No. 49]. Beginning on August 11, 2008, Bullock started calling in sick each day to Kraft's IVR line. [Wilson Aff. at ¶ 43].  On August 28, she sent a fax to Kraft claiming that her absence on August 26 should be counted as a worker's compensation leave day (which, under Kraft's FMLA policy, would also be an FMLA leave day).  [Palmer Aff. at ¶ 11 and Att. B; RFA Resp. No. 47].  On the same day, Bullock sent another fax stating, "August 27, 2008, absence to be a FMLA covered illnesses leave day."  [Palmer Aff. at ¶ 11 and Att. B].  On September 15, 2008, Bullock sent yet another fax, this time claiming FMLA leave for her absences from August 11 through 29 (excluding August 26) and September 2, 2008.  [*Id.*].  Thus, between August 11 and September 5, Bullock had added the following absences to her total of claimed FMLA days:

- August 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 25, 27, 28, and 29, 2008
- September 2, 3, 4, and 5, 2008[3]

[Palmer Aff. at ¶ 6 and Att. A; RFA Resp. No. 46].

This meant that, as of September 5, Bullock had claimed and been granted FMLA leave for well in excess of the twelve (12) weeks or sixty (60) days allowed by the FMLA.  [Palmer Aff. at ¶ 6 and Att. A].  Bullock was still on attendance probation following the issuance of her July 31 Step I discipline, so any absences in excess of her twelve (12) weeks of FMLA leave were unexcused and warranted moving her to Step II of the Attendance Program.  [Carlyle Aff. at ¶ 40].  Kraft served Bullock with a Step II discipline notice on September 22, 2008.  [*Id.* at

---

[3] Bullock called in sick on September 8, 9, 10, 11, 12, 15, 16, 17, 18, and 19, 2008. [Wilson Aff. at ¶ 43].

Att. P].  Bullock was also given a one week unpaid suspension and placed on an additional four (4) months of attendance probation.  [*Id.*].  Bullock filed her third EEOC Charge on September 23, 2008, again alleging race discrimination, disability discrimination, and retaliation.  [RFA Resp. Nos. 13-15; RFA Nos. 13-15 and Ex. E].

      3.    <u>Kraft Suspends Bullock Pending Termination</u>

Bullock called out sick again on September 29 and 30, 2008.  [Wilson Aff. at ¶ 43].  She also called out sick on October 1, 2008.  [*Id.*].  On October 2, 2008, Bullock called out sick through October 6, 2008. [*Id.*].  On October 6, Bullock called in yet again, this time saying that she would be out for sickness until October 21, 2008.  [*Id.*].  Bullock was also absent on October 21, 22, 23, and 24, 2008.  [RFA Resp. No. 49].  By October 24, 2008, Bullock had long since exhausted her FMLA entitlement—as she admits.  [Palmer Aff. at ¶ 6 and Att. A; Dep., Vol. II, p. 132].  Indeed, as of October 24, 2008, Bullock had been absent and claimed FMLA leave for more than *one hundred days* in the previous twelve (12) months.  [Palmer Aff. at ¶ 6 and Att. A].  Accordingly, Kraft sent Bullock a letter informing her that she had been moved to Step III of the Attendance Program, which is suspension pending termination.  [Carlyle Aff. at ¶ 41 and Att. Q**;** RFA Resp. No. 55; RFA No. 55 and Ex. T].  Kraft invited Bullock to provide it with any information that she might want to submit in her own defense by October 31, 2008.  [*Id.*].

On October 31, 2008, Bullock sent Tom Carlyle a letter in which she complained generally about Kraft's handling of her FMLA leave.  [RFA Resp. No. 46; RFA No. 56 and Ex. U].  She did not, however, offer any explanation for her continuing absences or why Kraft should treat them as excused. [*Id.*].  That same day, Holly Wilson received an email from Aetna, Kraft's third-party short-term disability administrator.  [Wilson Aff. at ¶ 40 and Att. N].  The email stated that Bullock had been approved for STD leave from August 11 through September 21,

2008.  [*Id.*].  Wilson, Carlyle, and Palmer understood the email to mean that Bullock's absences from August 11 through September 21, 2008 had been approved as STD leave but that Aetna had denied STD leave for any absences after that date.  [Carlyle Aff. at ¶¶ 43-45; Wilson Aff. at ¶¶ 40-41; Palmer Aff. at ¶¶ 12-14].  Thus, Wilson, Carlyle, and Palmer believed that Bullock's absences from September 22 through October 24, 2008, were not approved as STD leave.  [*Id.*].  Because Kraft ran FMLA and STD leaves concurrently, the notification from Aetna did not affect Wilson, Carlyle, and Palmer's assessment of Bullock's FMLA status or their conclusion that some or all of Bullock's absences after September 29, 2008 were not covered by the FMLA and were, thus, unexcused. [*Id.*].[4]

4.     Kraft Terminates Bullock's Employment Effective November 21, 2008

As of November 21, 2008, Bullock still had not returned to work.  [RFA Resp. No. 49].  Because Bullock had not provided any new information that would excuse her various absences after September 29, Kraft decided to terminate Bullock's employment in accordance with the Attendance Program.  [Carlyle Aff. at ¶ 46].  Carlyle sent Bullock a letter on November 21, 2008, informing her that her employment was being terminated effective that day.  [*Id.* and Att. T; RFA Resp. Nos. 58 and 59; RFA Nos. 58 and 59 and Ex. W].  Bullock's doctor did not release her to work until December 1, 2008.  [RFA Resp. No. 49].[5]  Bullock filed a fourth EEOC

---

[4] Aetna sent Bullock a similar letter on October 30, 2008, explaining that her request for STD leave for dates on or after September 22, 2008 was being denied. [App. 5: Letter produced by Bullock in response to RFPs].

[5] Bullock claims that, after her termination, Aetna reversed its decision regarding her request for STD leave and granted her leave for absences between September 22 and November 21, 2008.  [RFA Resp. No. 50].  This decision did not occur until May 14, 2009—almost six (6) months after Bullock's termination.  [*Id.*; App. 6: Letter produced by Bullock in response to RFPs].  At the time Bullock was terminated, Carlyle, Wilson, and Palmer all believed that Bullock's absences after September 22 had not been approved as STD leave.  [Carlyle Aff. at ¶ 44; Wilson Aff. at ¶ 41; Palmer Aff. at ¶ 13].

Charge on February 13, 2009, alleging that her termination constituted retaliation for the filing of her previous EEOC Charges.  [RFA Resp. Nos. 19-21; RFA Nos. 19-21 and Ex. G].  The EEOC dismissed this Charge—along with Bullock's third EEOC Charge—on June 24, 2010.  [RFA Resp. Nos. 16-18 and 22-24; RFA Nos. 16-18 and 22-24 and Exs. F and H].

### E.      Key Admissions from Bullock

During her deposition, Bullock made several key admissions that are material to this motion.  First, she admitted that she had exhausted her FMLA leave prior to her termination and that she continued to miss work after exhausting that leave.  [Dep., Vol. II, pp. 132: 1-7; 134: 19-23].  Second, she admitted that had never counted the number of absences she had in the twelve (12) months prior to her termination and that, if she wanted to determine how many absences she had, she would rely on Kraft's attendance records.  [*Id.*, pp. 123-24].

### III.      SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure requires a court to grant summary judgment:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); *see American Metal Forming Corp. v. Pittman*, 52 F.3d 504, 507 (4th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).  Where the plaintiff bears the ultimate burden of persuasion, the defendant satisfies its burden of showing that there is no genuine issue of material fact and that it merits judgment as a matter of law by simply identifying the absence of evidence supporting the plaintiff's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The "mere existence of a scintilla of evidence in support of the plaintiff's position" will not defeat summary judgment; rather, "there must be evidence on which the jury

could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252. As explained herein, Bullock has not even a "scintilla" of evidence to support her claims.

The Fourth Circuit has expressly recognized that trial judges have an "affirmative obligation . . . to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987). *See also Blair v. Colonnas Shipyard, Inc.*, 52 F. Supp. 2d 687, 692 - 93 (E.D. Va. 1999), *aff'd without op.*, 203 F.3d 819 (4th Cir. 2000). Thus, even in employment discrimination cases, summary judgment remains proper if the plaintiff cannot prevail as a matter of law. *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996). In this case, because there are no disputes of material fact and because Kraft is entitled to judgment as a matter of law, this Court should grant its Motion for Summary Judgment.

## IV.    <u>LEGAL ARGUMENT</u>

Bullock pursues three (3) claims in this lawsuit: (1) FMLA interference; (2) FMLA retaliation; and (3) Title VII retaliation. That is, she claims that Kraft denied her rights to which she was entitled under the FMLA and retaliated against her because she had filed various EEOC Charges and requested FMLA leave. As explained in detail, below, the undisputed material facts do not support these claims. To the contrary, they establish that Kraft provided Bullock with all the FMLA leave to which she was entitled (and more) and that it terminated her employment because she accrued excessive unexcused absences under its Attendance Program. Accordingly, Bullock's claims cannot succeed, and the Court should grant Kraft's motion for summary judgment.

A.      **Bullock's FMLA Interference Claim Fails as a Matter of Law.**

Bullock claims that Kraft interfered with her rights under the FMLA.  This claim fails as a matter of law because Bullock received all the leave she was entitled to under the FMLA—and more.

Under the FMLA, an "eligible employee" has the right to take up to twelve (12) weeks of leave from work during any 12-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of" his or her job. 29 U.S.C. § 2612(a)(1)(D). An employer who prevents or impedes an employee from exercising his or her FMLA rights is liable to the employee for, as appropriate, damages and equitable relief.   29 U.S.C. §§ 2615(a), 2617(a). To state a claim for FMLA interference, the employee must prove that the employer: (1) interfered with his or her exercise of FMLA rights; and (2) caused prejudice thereby.  *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89; 122 S. Ct. 1155; 152 L. Ed. 2d 167 (2002). Actionable interference exists where the employer impedes, restrains, or denies the exercise of any rights protected the FMLA. 29 C.F.R. § 825.220(a).[6] Prejudice exists where an employee loses compensation or benefits "by reason of the violation," 29 U.S.C. § 2617(a)(1)(A)(i)(I); sustains other monetary losses "as a direct result of the violation," § 2617(a)(1)(A)(i)(II); or suffers some loss in employment status remediable through "appropriate" equitable relief, § 2617(a)(1)(B).

Bullock cannot make either of the showings required to sustain an FMLA interference claim.  The undisputed facts demonstrate (and Bullock admits) that Kraft gave Bullock all the

---

[6] The DOL issued revised FMLA regulations in November 2008.  Those regulations became effective in 2009, after Bullock had been terminated.  Accordingly, all references to FMLA regulations in this brief refer to the regulations as they existed prior to Bullock's termination.

leave she was entitled to under the FMLA, making it impossible for Bullock to show that Kraft interfered with her FMLA rights.  [Palmer Aff. at ¶ 6 and Att. A; Dep., Vol. II, pp. 132-34]. Under the FMLA, Bullock was entitled to twelve (12) weeks (or sixty (60) days)) of FMLA leave in the twelve (12) months preceding her termination.  The undisputed facts establish that, in fact, she was absent more than *one hundred days* in that time period—well in excess of the time allowed by the FMLA.  Accordingly, it is clear that Bullock received all the leave that she was entitled to under the FMLA—and more.  She could not return to work at the end of those twelve (12) weeks, meaning that Kraft was within its rights to treat her subsequent absences under the Attendance Program and to terminate her employment under that Program.  *Ragsdale*, 535 U.S. 84-86; 122 S. Ct. 1158-59. Accordingly, she cannot prevail on her FMLA interference claim.[7]

## B.     Bullock's FMLA Retaliation Claim Fails as a Matter of Law.

Bullock's FMLA retaliation claim also fails as a matter of law.  To establish a *prima facie* case of retaliation under the FMLA, a plaintiff must prove three elements: (1) she "engaged in protected activity;" (2) "an adverse employment action was taken against her;" and (3) "there was a causal link between the protected activity and the adverse employment action." *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004).[8] A *prima facie* "causal connection" is either direct

---

[7] During her deposition, Bullock expressed a belief that Kraft should not have terminated her employment because she was on an approved STD leave at the time.  [Dep., Vol. II, pp. 132-34].  Leaving aside the fact that her STD leave was not approved until months after her termination, this fact makes no difference to the outcome of the case.  First, it is undisputed that Kraft treats STD absences under its Attendance Program.  [Carlyle Aff. at ¶ 17].  Even if Kraft did have a policy that protected STD absences, any violation of that policy would not give rise to an FMLA claim.  *Miller v. Personal-Touch of Virginia, Inc.*, 342 F.Supp.2d 499, 512 (E.D. Va. 2004) (violation of internal policy does not itself support a statutory FMLA violation).  *See also Dolese v. Office Depot, Inc.*, 231 F.3d 202, 203 (5th Cir. 2000) (collecting cases at f. 12).

[8] Claims of retaliation under the FMLA are evaluated under the *McDonnell Douglas*, burden-shifting framework.  *See Perry v. Computer Sciences Corp.*, 2011 U.S. App. LEXIS 9564 (4th Cir. 2011); *see also, Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 550-551 (4th

evidence that the adverse employment action happened because of the prior protected activity, *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365-66 (4th Cir. 1985) (*abrogated on other grounds by Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)), or circumstantial evidence showing "that Defendant had knowledge of the protected activity and that the temporal proximity between the employer's knowledge of protected activity and the [adverse action] was 'very close,'" *Bullard v. Panasonic Corp. of America*, 418 F. Supp. 2d 802, 814 (E.D. Va. 2006) (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)).  As temporal proximity fades, the inference of causal connection weakens. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("A lengthy time lapse . . . negates any inference that a causal connection exists."). There is no bright-line rule; however, a three-to four-month delay has been held to be too long to establish a causal connection. *Breeden*, 523 U.S. at 273-74.

If the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to proffer evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Matvia v. Bald Head Island Mgmt., Inc*., 259 F.3d 261, 270-71 (4th Cir. 2001). The ultimate burden of "persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000).  Thus, if the defendant carries its burden, then the *prima facie* case disappears and the burden of production shifts back to the plaintiff to show that the given reason is pretextual. *See Reeves*, 530 U.S at 142-43. Pretext is not established by

---

Cir. 2006) ("FMLA claims  arising under the retaliation theory are analogous to those derived under Title VII and so are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-06, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)") (citation omitted).

disbelief, *Id.* at 146-47, rather, the plaintiff must show that the articulated reason is "unworthy of credence or . . . offer[] other forms of circumstantial evidence sufficiently probative of [retaliation]." *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004) (citing *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004)).

Bullock cannot even make out a *prima facie* case of FMLA retaliation.  The only possible evidence Bullock has of a causal connection between her termination and her requests for FMLA leave is temporal—i.e. her termination occurred approximately two (2) months after she requested FMLA leave for the last time in September 2008.  However, this evidence cannot, standing alone, sustain an inference of causation in this case.  Bullock had been taking FMLA leave regularly since at least 2006, but she was not terminated until November 2008—a time period of more than two (2) years.  [Wilson Aff. at ¶ 4; RFA Resp. Nos. 58-59].  Such a gap is much too significant to suggest a causal connection between Bullock's requests for FMLA leave and her termination.  *Breeden*, 532 U.S. at 273-74.

Regardless, even if Bullock could make out a *prima facie* case of FMLA retaliation, Kraft has proffered a legitimate, non-retaliatory reason for its decision to terminate her employment: after she exhausted her FMLA leave entitlement, she accrued unexcused absences that warranted termination under Kraft's Attendance Program.  [Carlyle Aff. at ¶ 46].  No evidence suggests that this reason is pretextual.  Indeed, by admitting that she exhausted her FMLA leave and continued to miss work, Bullock essentially admits that the reason is true.

As mentioned above, Bullock has claimed that her termination was inappropriate because she was on an approved STD leave at the time.  The Court should ignore this claim because no facts support Bullock's assertion that there was something inappropriate about terminating Bullock while she was allegedly on an approved STD leave.  To the contrary, the undisputed

facts establish that Kraft treated approved STD absences under its Attendance Program. [Carlyle Aff. at ¶ 16]. Regardless, even if there were some significance to the fact that Bullock was approved for STD leave, her claim does not suggest that Kraft is not telling the truth about its reason for terminating her employment. It is undisputed that Bullock's request for STD leave was not approved until *after* her termination and that, at the time of her termination, her request for continuing STD leave had been denied. The fact that her leave was belatedly approved says *nothing* about Kraft's intent at the time of her termination.

Bullock also has pointed to several comparators in an attempt to question the decision to terminate her employment. Specifically, Bullock's Amended Complaint claims that Kraft treated similarly-situated white males more favorably with respect to requests for leave in that she was subject to "increased scrutiny" of her FMLA requests. [Am. Comp. at ¶ 102]. Bullock's deposition made it clear, however, that this claim is based purely on hearsay. [Dep., Vol. II, pp. 137-46]. Regardless, even if this testimony were admissible, it is insufficient to establish that the employees in question were similarly situated with respect to number of absences and adequacy of medical certifications submitted to Kraft. *Odom v. Internat'l Paper Co.*, 652 F.Supp.2d 671, 688 (E.D. Va. 2009) (comparators must be similar in all relevant respects).[9] Thus, this testimony does nothing to undermine the veracity of Kraft's reason for terminating Bullock or save her claims from summary judgment.

The record evidence makes it clear that Bullock was terminated for excessive absences under Kraft's Attendance Program. Far from bringing forward evidence to undermine this

---

[9] In addition, to the extent that Bullock is complaining that Kraft asked her to substantiate her need for FMLA leave, it goes without saying that merely asking for what it is entitled to under the FMLA does not constitute an "adverse action" for purposes of establishing and FMLA retaliation claim. *Ridings v. Riverside Medical Center*, 537 F.3d 755, 772 (7th Cir. 2008).

reason, Bullock actually admits that she exhausted her FMLA leave entitlement and continued to miss work thereafter—that is, she admits the truth of Kraft's reason for terminating her. Accordingly, Bullock's FMLA retaliation claim cannot succeed and summary judgment is warranted.

**C.      Bullock's Title VII Retaliation Claim Fails as a Matter of Law.**

Bullock's Title VII retaliation claim fails for the same reason that her FMLA retaliation claim fails.  To establish a *prima facie* case of Title VII retaliation, the plaintiff must prove that (1) she engaged in prior activity protected by Title VII; (2) that she suffered an adverse employment action; and (3) there is a causal connection between the prior protected activity and the adverse employment action.  *Nasis-Parsons v. Wynne*, No. 05-36, 2006 U.S. Dist. LEXIS 35325, at *8 (E.D. Va. June 1, 2006) (citing *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006)).  If she meets this burden, the burden shifts to Kraft to proffer a legitimate, non-retaliatory reason for its actions.  As previously explained in relation to her FMLA retaliation claim, the ultimate burden of "persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143; *see also*, Section IV. B., *supra* (discussion concerning requirement to establish pretext).  Thus, once Kraft has met its burden of producing a legitimate, non-retaliatory reason for its actions, the burden shifts back to the plaintiff to prove that Kraft's reason is pretextual.

Bullock cannot make out a *prima facie* case of retaliation.  It is true that she filed an EEOC Charge in September 2008, approximately two (2) months prior to her termination. However, standing alone, such temporal proximity is not enough to establish a *prima facie* case. Bullock had already filed two (2) other EEOC Charges by September 2008—with the first

coming two (2) years earlier, in 2006—and had not been terminated.  Thus, the fact that she was terminated approximately two (2) months after filing her third Charge does not suggest that Kraft was retaliating against her.  Moreover, Bullock exhausted her FMLA leave and accumulated a significant amount of unexcused absences after the filing of the September 2008 Charge.  These intervening events erase any suggestion that the timing of her termination was suspiciously close to her termination.  *Cheshewalla v. Rand & Son Construction Co.*, 415 F.3d 847, 852 (8th Cir. 2005) (intervening events can erode any causal connection suggested by temporal proximity).

Regardless, even if Bullock could make out a *prima facie* case of retaliation, as explained above, Kraft has proffered a legitimate, non-retaliatory reason for its decision to terminate her— i.e. excess unexcused absences under its Attendance Program.  [Carlyle Aff. at ¶ 46]. Moreover, as explained above, Bullock possesses no evidence to suggest that this reason is pretextual. Accordingly, her Title VII retaliation claim cannot succeed.

## V.      CONCLUSION

Bullock admits that she exhausted her FMLA leave prior to her termination and that she subsequently missed more days of work.  Thus, by her own admission, she was given all the leave she was entitled to under the FMLA, and her FMLA interference claim cannot succeed.  In addition, the undisputed facts demonstrate that Bullock was terminated after she exhausted her FMLA leave entitlement and continued to miss work.  This is a legitimate, non-retaliatory reason for terminating Bullock's employment, and she has come forward with no evidence that would prove that this reason is pretextual.  Accordingly, her FMLA and Title VII retaliation claims cannot succeed.

Therefore, Defendant, Kraft Foods Global, Inc., respectfully requests that the Court grant

its Motion for Summary Judgment and dismiss Plaintiff Sherry Bullock's Amended Complaint in

its entirety.

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

_____/s/ John B. Flood_____
By: John B. Flood, VA Bar No. 79813
1909 K Street, N.W., Suite 1000
Washington, D.C.  20006
Tel: (202) 887-0855
Fax: (202) 887-0866
Email: john.flood@ogletreedeakins.com


Charles B. Baldwin, IN Bar No. 4108-49 (admitted *pro hac vice*)
Susannah P. Mroz, IN Bar No. 26514-49 (admitted *pro hac vice*)
111 Monument Circle, Suite 4600
Indianapolis, IN 46204
Tel: (317) 916-1300
Fax: (317) 916-9076
Email: charles.baldwin@ogletreedeakins.com
Email: susannah.mroz@ogletreedeakins.com

*Attorneys for Defendant*

Dated: September 13, 2011

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| Sherry A. Bullock, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) Civil Action No:  3-11-cv-00036-HEH |
| | ) |
| Kraft Foods, Inc., | ) |
| | ) |
| *Defendant*. | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2011, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

John B. Mann, Esq.
JOHN B. MANN, P.C.
2201 Libbie Ave., Suite 200
Richmond, VA 23230
jmann@canfieldbaer.com


_____/s/ John B. Flood_____
John B. Flood, VA Bar No. 79813
Ogletree, Deakins, Nash,
  Smoak & Stewart, P.C.
1909 K Street, N.W., Suite 1000
Washington, D.C.  20006
Tel:  (202) 887-0855
Fax: (202) 887-0866
Email: john.flood@ogletreedeakins.com

*Attorney for Defendant*