IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| SHERRY A. BULLOCK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 3:11CV36–HEH |
| | ) |
| KRAFT FOODS, INC., | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION
(Granting Defendant's Motion for Summary Judgment)

This is an action for damages and other relief under the Family Medical Leave Act of 1993 ("FMLA" or "the Act"), 29 U.S.C. § 2615, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 *et seq.* It is presently before the Court on Defendant's Motion for Summary Judgment. Because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid in the decisional process, the Court will dispense with oral argument. For the reasons that follow, the Motion will be granted.

### I. BACKGROUND

#### A. Kraft's Attendance Program

Kraft Foods Global, Inc. ("Kraft" or "Defendant")[1] is a public corporation that manufactures and distributes food products internationally. From 1991 until her recent termination, Plaintiff Sherry A. Bullock ("Bullock" or "Plaintiff") was employed at Kraft's bakery facility in Richmond, Virginia. As with all other hourly employees at the

---

[1] Plaintiff's Amended Complaint incorrectly identified the Defendant as Kraft Foods, Inc.

Richmond plant, Bullock was subject to an attendance policy throughout the duration of her tenure. (Carlyle Aff. Ex. B.)

Under Kraft's Attendance Program, employees are disciplined at three different stages upon the occurrence of a specified number of "incidents." For example, an unexcused absence of up to four days counts as a single incident for each day missed, and a failure to properly report the absence yields a two-incident penalty. (*Id.* Ex. C.) At Step I of the Program, once an employee accumulates six incidents within a six-month period, she is issued a written warning and placed on probation for three months. Any additional unexcused absence during the probationary period automatically advances the employee to Step II: a one-week suspension without pay and four months of probation. Thereafter, an employee's absence from work while on probation triggers Step III. At this final stage of discipline, an employee is suspended pending possible discharge. (*Id.*)

Kraft provides a number of exceptions to its attendance policy where an employee's absence is health related. First, an employee may take up to twelve weeks of approved leave annually pursuant to the Family Medical Leave Act (FMLA). Since January 1, 2007, Kraft has used a "rolling backward" leave year, whereby an employee's current FMLA leave eligibility is determined by calculating the amount of leave taken in the twelve months prior to the absence in question. (*Id.* Ex. D.) As permitted by the Act, Kraft requires employees seeking FMLA protections due to a serious health condition to submit a medical certification issued by the employee's physician.[2] Employees must coordinate their leave with the Richmond bakery's FMLA Coordinator, Sherri Palmer.

---

[2] Some employees, including Bullock, opt to use the Certification of Health Care Provider form, Form WH-380, provided by the U.S. Department of Labor.

2

(Carlyle Aff. at ¶ 18.) Holly Wilson, a registered nurse at the Richmond facility, also assists in maintaining employees' attendance records. (Wilson Aff. at ¶¶ 2, 4-5.)

In addition, Kraft grants each employee in a six-month period a "short note" multiple-day absence due to illness, as well as a "long note" absence of ten or more consecutive days. These special allowances are available only to employees not currently on disciplinary probation, and must be supported by adequate written medical documentation.[3] (*Id.* Ex. C.) Finally, Kraft also maintains a worker's compensation and short-term disability (STD) policy. Notably, an absence under any one of these four non-FMLA exceptions may also qualify as FMLA leave. For instance, a work-related injury might concurrently trigger an employee's entitlement to workers' compensation leave *and* FMLA leave. Thus, when determining the balance of an employee's FMLA leave, Kraft counts *all* medically-excused absences. (*Id.* Ex. E.)

### B. Bullock's Medical Leave and Disciplinary Termination

Throughout her employment with Kraft, Bullock suffered from diabetes, hypertension, and foot problems. Because these conditions required her to be absent from work, Bullock frequently sought to take FMLA leave. The parties in this case focus particularly on the course of Bullock's attendance in the two years before her discharge.

In the first half of 2007, Bullock made several requests for FMLA leave. As required by Kraft, she submitted Certification of Health Care Provider forms in support of her claims on May 29 and July 3, 2007. Wilson interpreted the certifications to

---

[3] While an employee is "on absentee probation ... the only excusable absences will be vacation, holidays (unless scheduled to work), death in the family (outlined in the contract), jury duty, military leave and union business." (Carlyle Aff. Ex. C.)

3

indicate merely that Bullock would need to attend bi-monthly medical appointments during the workday. (*Id.* at ¶ 15.) Contrary to Wilson's expectations and the physicians' representations, however, Bullock was absent for ten full days in May and June 2007.

Bullock was again absent and claimed FMLA leave on January 31 and February 1 and 3, 2008. Kraft's FMLA log showed, however, that Bullock had already exhausted her leave allowance in the previous twelve months. It therefore treated those absences as unexcused. (*Id.* at ¶ 21.) Company records also indicated that Bullock had failed to properly report three prior absences in late 2007. Thus, finding six attendance incidents in a six-month period, Kraft implemented Step I disciplinary measures.

During the resulting probationary period, Bullock incurred yet another unexcused absence on February 8, 2008. Under the terms of the Attendance Program, Bullock's violation of her probation automatically triggered Step II. Therefore, on February 20, 2008, Kraft notified Bullock that she would be suspended without compensation for one week and placed on probation for a period of four months.

Bullock's ailments and absenteeism continued into the summer of 2008. According to Palmer, Bullock was absent from work and requested FMLA leave for eighty full days between July 2007 and July 2008. (Palmer Aff. Att. A.) Although Bullock furnished an additional Certification on January 11, 2008 attesting to her hypertension and diabetes, Wilson did not deem it sufficient to justify "frequent full day[]" work absences. (Wilson Aff. at ¶ 24.) Indeed, the signing physician provided only that Bullock would "need to come in for frequent office visits." (*Id.* Ex. I.) As a result, Kraft determined that "[a]s of late May 2008, Bullock still had not submitted

4

complete and sufficient medical certifications that supported ... her need to miss work any more than once every several months for doctor's appointments." (*Id.* at ¶ 32.)

Bullock disagreed with Kraft's treatment of her absences, and in late-2007 or early-2008 filed a complaint with the U.S. Department of Labor (DOL). After cooperating with the ensuing investigation, Kraft received an FMLA violation notice on May 14, 2008. (Carlyle Aff. Ex. I.) Specifically, DOL found that Kraft had incorrectly charged Bullock's twelve-week entitlement for weekend overtime absences in 2007 and 2008. The letter also disclosed that Kraft violated the Act by requiring Bullock to take off nine work days in September 2007 due to injury instead of honoring a physician's certification merely restricting Bullock to her normal eight-hour weekday shifts. The Labor Department did not find Kraft's determination as to the insufficiency of Bullock's Certification forms to be improper.

On May 30, 2008, Kraft retroactively granted Bullock FMLA leave not only for the problematic dates identified by DOL, but for *all* of Bullock's medically-related absences. (*Id.* Ex. J; Wilson Aff. at ¶ 33.) That is, in addition to excluding from her FMLA usage all weekend overtime absences, Kraft "agreed to overlook" Bullock's failure to submit adequate medical documentation and granted Bullock sixty-two days of FMLA leave during the period from May 11, 2007 to May 12, 2008. (Carlyle Aff. at ¶ 29.) Moreover, Kraft excused Bullock's absences on April 11 and 12, 2008 under its "short note" exception, even though Bullock had no FMLA leave available as of those dates. (*Id.* Ex. J.) Finally, Kraft rescinded its Step I and Step II disciplinary measures and agreed to compensate Bullock for her unpaid suspension. (*Id.*)

5

As of that same date, Kraft's Human Resources Manager, Thomas Carlyle, informed Bullock that she had thirty-two hours of FMLA time available. (*Id.* Ex. N.) Bullock then failed to report to work on June 2, 3, or 4. (*Id.*) By Kraft's calculations, therefore, Bullock exhausted her leave entitlement "after [her] absence on June 6, and again after [her] absence on July 14, and again after [her] absence on July 23." (*Id.*) In a letter dated July 29, 2008, Carlyle notified Bullock that her absences on July 15-18 and 25 warranted Step I discipline. Carlyle further clarified that because Kraft did not have a proper Certification of Health Care Provider form on file for her,[4] Bullock's leave requests would be granted only provisionally. Finally, Carlyle offered to meet with Bullock personally "to show [her] the [FMLA] calculation in detail."[5] (*Id.*)

On August 10, 2008, Bullock reported to work for the last time. Every day thereafter, she called in sick. (Wilson Aff. at ¶¶ 39-40, 43.) (Palmer Aff. Att. A.) Although Bullock submitted a Certification on August 29, 2008, it provided only that she should be limited to eight-hour workdays for a period of two months due to pain and swelling in her feet.[6] (Pl.'s Resp. Exs. 24-25.) Kraft deemed Bullock's FMLA entitlement exhausted, and her absences therefore unexcused, on August 26 and September 3, 4, and 5. Because these absences occurred during a probationary period, Kraft implemented Step II disciplinary measures on September 22, 2008, including a

---

[4] Bullock submitted identical Certification of Health Care Provider forms in June and August 2008. As both indicated only that Bullock's "hypertension and diabetes [would] require frequent visits to the doctors [sic] office," (Wilson Aff. Exs. K-L), Wilson did not deem them sufficient to justify Bullock's frequent full-day and multiple-day absences. (*Id.* at ¶¶ 31-32.)

[5] There is no indication in the record that Bullock met with Carlyle or any other human resources officer at Kraft to review her FMLA usage.

[6] Asked on the Certification whether Bullock was "unable to perform work of any kind," the physician stated: "no more than 8 hours a day 5 days a week." (Pl.'s Resp. Ex. 25.)

mandatory one-week suspension. (Carlyle Aff. Ex. P.) In total, Bullock accumulated twenty-nine absences during the months of August and September.

By late October, Bullock still had not returned to work. In fact, Kraft records reflected that as of October 24, 2008, Bullock had been absent and claimed FMLA leave for more than 110 days in the previous twelve months. (Palmer Aff. Ex. A.) As at least some of her continued absences were not covered by FMLA leave,[7] Kraft implemented Step III of the Attendance Program. Carlyle notified Bullock by letter on October 24, 2008 that she was suspended pending possible discharge. (Carlyle Aff. Ex. Q.) Carlyle also requested that Bullock provide any additional information that might excuse her persistent truancy. In her response, Bullock advised Carlyle that he "should be requesting any information need [sic] from the Union." (*Id.* Ex. R.) When Bullock had still not returned to work on November 21, 2008, Kraft sent her a termination letter.

Bullock filed charges of discrimination against Kraft with the Equal Employment Opportunity Commission (EEOC) on November 20, 2006; March 28, 2008; September 23, 2008; and February 13, 2009. (Def.'s RFA Resp. Exs. A, D, E, G.) Each Charge was dismissed. On June 24, 2010, however, Bullock received a right-to-sue notice from the

---

[7] On October 31, 2008, Wilson received an e-mail from Aetna, Kraft's third-party short-term disability administrator, approving Bullock for STD leave from August 11 through September 21, 2008. (Wilson Aff. Ex. N.) Bullock's absences from September 22 through October 24, however, remained unexcused. Further, as FMLA and STD leave run concurrently under Kraft's policy, Atena's notice did not affect the exhaustion of Bullock's FMLA entitlement. (*See* Carlyle Aff. at ¶¶ 16-17, 45 ("If days missed under an approved STD leave were not otherwise excused by the Attendance Program (such as being excused as an approved FMLA absence or under a "Long Note"), then they were not excused under the Attendance Program and were treated like any other unexcused absence for purposes of discipline."); Palmer Aff. at ¶ 14.) Thus, the STD approval did not cause Kraft to alter its disciplinary course.

EEOC, and on September 23, 2010 she filed suit in the City of Richmond Circuit Court. Kraft timely removed the action to this Court on January 14, 2011.

On May 17, 2011, Bullock filed an Amended Complaint, in which she asserts three separate causes of action. Count One alleges that Kraft retaliated against Plaintiff for lodging discrimination charges with the EEOC, in violation of Title VII. In Count Two, Bullock claims that Kraft interfered with the exercise of her rights under the FMLA, and ultimately retaliated against her for seeking and taking medical leave under that Act. Kraft filed the present motion for summary judgment on September 13, 2011, and Bullock responded. The matter is now ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if the evidence, when viewed "in the light most favorable to the non-moving party," *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990), "is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion" and "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this initial burden, however, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P.

56(e)). "A mere scintilla of evidence supporting [her] case is insufficient," *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citing *Anderson*, 477 U.S. at 248), and "a complete failure of proof concerning an essential element of the [plaintiff's] case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Where the record taken as a whole cannot lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial and summary judgment is appropriate. *Matushita*, 475 U.S. at 587.

### III. ANALYSIS

#### A. Plaintiff's FMLA Interference Claim

Under the FMLA, qualifying employees are guaranteed twelve weeks of unpaid medical leave each year. To prevail under the cause of action set forth in 29 U.S.C. § 2617, an employee must prove that her employer interfered with, restrained, or denied her exercise of FMLA rights, and that such a violation prejudiced the employee. Specifically, the plaintiff must establish that "(1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006). In this case, Plaintiff has failed to make the requisite showing.

At the outset, the Court is mindful that Bullock at no point provided Kraft with documentation stating that it was medically necessary for her to be absent from work for full days, much less entire weeks at a time. The Court has carefully reviewed each

9

Certification of Health Care Provider form and all other physicians' statements submitted by Plaintiff to the Court and tendered to Kraft throughout the duration of her employment. Uniformly, all of the forms either (1) provide that Bullock would occasionally be required to miss work for doctor's office visits, or (2) limit her to an eight-hour work day.[8] None indicates a complete incapacitation or inability to work, and thus none justifies Bullock's repeated and extended periods of complete absence.

Even so, this case distills to a single dispositive fact: that Kraft gave Bullock not only the full amount of leave required under the FMLA, but more. Bullock's claim that Kraft "harass[ed] [her] about her attempts to take leave under the ... FMLA" is wholly unsupported by the evidence. (Pl.'s Am. Compl. at 6.) So too is her contention that Kraft employees, including Holly Wilson, were "rude, disrespectful, and deliberately unhelpful in [their] interactions with [P]laintiff concerning approval of FMLA." (*Id.* at 8.) Bullock has also failed to substantiate her claim that "Kraft repeatedly threatened [her] with termination should she continue to claim entitlement to FMLA leave ... and file complaints about her treatment by [D]efendant Kraft." (*Id.*)

---

[8] *See, e.g.*, Pl.'s Resp. Ex. 2 (April 3, 2006 certification, requiring twice weekly physical therapy appointments); *id.* Ex. 6 (Aug. 16, 2006 certification, requiring office visits of "1-2 hours" in duration "every 2-3 months" and "visits to the lab to have blood work done ... about 4 times yearly"); *id.* Ex. 7 (May 24, 2007 certification, requiring office vists "every 2-3 mos. with bloodwork [sic] ... 4x/yr."); *id.* Ex. 8 (July 2, 2007 certification, requiring office visits every "2-3 mos. with bloodwork [sic] a minimal 4x/yr"); *id.* Ex. 10 (Sept. 6, 2007 certification, limiting Bullock to eight-hour work days); *id.* Ex. 12 (January 24, 2008 physician's statement, restricting Bullock to eight-hour work days); *id.* Ex. 16 (January 11, 2008 certification, providing that "patient will need to come in for frequent office visits"); *id.* Ex. 23 (May 14, 2008 certification, stating that "[p]atient needs frequent office visits"); *id.* Ex. 24 (June 11, 2008 physician's statement, limiting Bullock to eight-hour work days for period of two months); *id.* Ex. 25 (Aug. 29, 2008 certification, restricting Bullock's work schedule to "no more than 8 hours a day 5 days a week"); *id.* Ex. 54 (Oct. 6, 2008 physician's statement permitting Bullock to "return to work ... at light duty only"); *id.* Ex. 60 (Nov. 26, 2008 physician's statement, allowing Bullock "to return to work on Monday, December 1, 2008" without restrictions).

The evidence before the Court reveals that Kraft did not interfere with Bullock's rights under the Act; to the contrary, Kraft enhanced those rights by voluntarily authorizing FMLA leave beyond the twelve weeks mandated by law. Most notably, after Kraft received notice from the Department of Labor that it had improperly designated some of Bullock's missed overtime weekend shifts as FMLA leave, the company excused those shifts *and all other* prior medically-related absences—well in excess of Bullock's legal entitlement. Further, Kraft excused numerous absences under its "short note" exception, even though Bullock had no remaining FMLA time on those dates.

Secondly, even if Bullock could identify some technical statutory violation in Kraft's course of conduct, she has failed to present any evidence that she was prejudiced as a result. To determine if a plaintiff has met its burden to show that she suffered harm "by reason of" or "as a direct result of" her employer's unlawful actions, a court must ask "what steps the employee would have taken ... in the absence of the employer's actions." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89-91 (2002) (citations omitted). Bullock claims that Kraft contravened the FMLA by failing to timely inform her when she was denied leave (Pl.'s Resp. ¶¶ 27-28), and by not providing her with regular notice of her leave usage and balance (*id.* ¶ 72). Yet even if that were so,[9] Plaintiff "has not shown that she would have taken less leave ... if she had received [such] notice." *Ragsdale*, 535 U.S. at 90 (finding no actual impairment of FMLA rights where "[e]ven if

---

[9] It is not necessarily so. The record contains numerous letters from Thomas Carlyle, Kraft's Human Resources Manager, informing Bullock of her FMLA usage and the status of her leave requests. (See, e.g., Pl.'s Resp. Ex. 32 ("This letter is intended to update you regarding your FMLA and attendance status with Kraft...."); *id.* Ex. 35 (explaining the inadequacy of Bullock's Certification of Health Care Provider submissions); *id.* Ex. 37 (denying various leave requests and providing Bullock's current FMLA leave balance)).

[the employer] had complied with the notice regulations, [the employee] still would have taken the [same extended] absence").

To the contrary, Bullock concedes that she would have used the entirety of her leave entitlement in the months preceding her termination. Bullock claims that she had forty-eight hours of FMLA time remaining as of August 10, 2008.[10] (Bullock Aff. Ex. 1.) She exhausted that balance on August 18. Plaintiff further acknowledges that she did not recoup additional FMLA time until Sept. 24, 2008—substantially longer than six days after her string of absences began on August 11, 2008. (*Id.*) Accordingly, even by her own account, Bullock's absences on August 19 and every day thereafter, until at least September 24, 2008, were not covered by the Act.[11] And since Bullock "had no reason to be absent other than the fact that [she] *could not work* due to [her] medical conditions" (Bullock Aff. 4 (emphasis added)), such absences were—according to her—unavoidable. Because Plaintiff would have exhausted her twelve weeks of leave and incurred numerous unexcused absences *in any event*, she has not shown that she was harmed by Defendant's alleged failure to account properly for her FMLA usage.

---

[10] Although the parties offer differing calculations of Bullock's FMLA leave usage, both accounts show that Bullock received her full entitlement under the Act, and that she accrued a substantial number of unexcused absences. Accordingly, both support the entry of summary judgment in Kraft's favor. *See Anderson*, 477 U.S. at 247-48 (providing that the existence of an alleged factual dispute "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact" (emphasis added)).

[11] When asked at her deposition whether "[t]here came a point prior to [her] termination from Kraft where [she] ... [was] missing work and ... did not have FMLA-covered days left to cover those absences," Bullock responded "Yes." (Bullock Dep., Vol. II, p. 132:1-7.) Although she claims otherwise in her affidavit, a "plaintiff's own opinions and conclusory allegations do not have sufficient probative force to reflect a genuine issue of material fact." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (internal quotation omitted)).

Notwithstanding this exhaustion of her statutory entitlement, Plaintiff points out that she was retroactively approved on Oct. 31, 2008 for short-term disability (STD) leave from August 11 through September 21, 2008. As a result, she contends that her absence during that period of time was excused. Bullock also claims that she was entitled to a "long note" exception. Her argument is misguided.

Separate and apart from the twelve weeks of leave it is required to provide employees pursuant to the FMLA, Kraft *voluntarily* maintains various allowances under its Attendance Program, including an STD leave policy and its "short note" and "long note" exceptions. It has no *legal* obligation to do so.[12] Consequently, Kraft's purported maladministration of such policies does not support a cause of action under the FMLA. *Cf. Miller v. Personal-Touch of Va., Inc.*, 342 F. Supp. 2d 499, 512 (E.D. Va. 2004) ("[V]iolation of an employer's internal policy does not itself support a statutory FMLA violation."). Further, Kraft may "count[]" leave taken under such supplemental policies "toward the 12 weeks guaranteed by the FMLA." *Ragsdale*, 535 U.S. at 87; *see also* 60 Fed. Reg. 2230 (1995) ("[E]mployers may designate paid leave as FMLA leave and offset the maximum entitlements under the employer's more generous policies."). In short, even if it were shown that Kraft impaired these discretionary benefits,[13] such

---

[12] The FMLA "encourages businesses to adopt more generous policies," beyond the twelve weeks of leave guaranteed by the Act. 535 U.S. at 84. *Encouraging* such supplemental policies, however, is different from *requiring* them.

[13] Kraft denies that Bullock was entitled to a "long note" exception. Specifically, it claims that Bullock failed to provide adequate medical documentation to trigger the allowance, and that, regardless, her probationary status rendered her ineligible. Upon review of the evidence, the Court agrees. However, because Bullock's entitlement to a "long note" absence is not material to her cause of action under the FMLA, the Court need not dwell on this factual dispute. *See Anderson*, 477 U.S. at 247-48.

actions would not amount to harmful interference with Plaintiff's exercise of her rights under the FMLA. Therefore, Bullock cannot prevail in her FMLA interference claim.

### B. Plaintiff's FMLA Retaliation Claim

In addition to providing a "prescriptive" right to twelve weeks of unpaid leave, the FMLA provides "proscriptive" rights "that protect employees from discrimination or retaliation for exercising their substantive rights" under the Act. *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006) (citation omitted). Thus, "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions." *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 294-95 (4th Cir. 2009) (quoting 29 C.F.R. § 825.220(c)). Bullock claims that Kraft terminated her because she "avail[ed] herself of her protected medical leave rights under the FMLA." (Pl.'s Am. Compl. at ¶ 115.)

As the Fourth Circuit has explained, FMLA retaliation claims are analyzed under the "burden-shifting framework" of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-06 (1973). Therefore,

> [T]o succeed on [her] retaliation claim, [Bullock] must first make a prima facie showing that [s]he engaged in protected activity, that the employer took adverse action against [her], and that the adverse action was causally connected to the [Bullock's] protected activity. If [s]he puts forth sufficient evidence to establish a prima facie case of retaliation and [Kraft] offers a non-discriminatory explanation for [her] termination, [Bullock] bears the burden of establishing that the employer's proffered explanation is pretext for FMLA retaliation.

*Yashenko*, 446 F.3d at 551 (internal quotations and citations omitted). Although the burden of production in a retaliation case may shift, the burden of persuasion "remains at

all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quotations and citation omitted).

In this case, Kraft does not dispute that Bullock engaged in a protected activity—namely, taking FMLA leave—and that her termination constituted an adverse employment action. Accordingly, in order to make out a prima facie case, Bullock "must demonstrate that there was a causal connection between [her] taking leave and [her] termination." *Id.* That is, she must proffer either direct evidence that she would not have been discharged but for her taking FMLA leave, *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365-66 (4th Cir. 1985), or circumstantial evidence showing "that Defendant had knowledge of the protected activity and that the temporal proximity between the employer's knowledge of protected activity and the [adverse action] was 'very close.'" *Bullard v. Panasonic Corp. of N. Am.*, 418 F. Supp. 2d 802, 814 (E.D. Va. 2006) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

The Court can find no evidence in the record that directly supports Bullock's contention that she was discharged for taking leave to which she was statutorily entitled. Nor is there is a sufficiently "close" nexus between Bullock's frequent taking of FMLA leave (starting in 2006, at the latest) and her eventual termination in late-2008 to support an inference of causation. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("A lengthy time lapse ... negates any inference that a causal connection exists."); *see, e.g., King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (finding a delay of two months and two weeks to be "sufficiently long as to

weaken significantly the inference of causation between the two events"). Accordingly, Bullock has not made a prima facie showing of retaliation.

Regardless, even if Bullock's evidence forged a causal link between the exercise of her FMLA rights and her termination, Kraft has offered a plausible non-discriminatory explanation for its actions. Kraft contends that it "terminated [Bullock's] employment because she accrued excessive unexcused absences under its Attendance Program." (Def.'s Mem. Supp. 12.) Although "employers cannot use the taking of FMLA leave as a negative factor in employment actions," 29 C.F.R. § 825.220(c), an employer does not act unlawfully by disciplining an employee for taking far *more* than her twelve weeks of guaranteed leave. The record makes clear that Kraft imposed progressive disciplinary measures and eventually terminated Bullock when she repeatedly violated the terms of the company's Attendance Program by failing to report for work *after* exhausting her entitlement, and *after* receiving numerous warnings to that effect. Bullock has not shown that Kraft's justification for its actions was mere pretext. *See Reeves*, 530 U.S. at 143 ("[T]o prove ... that the legitimate reasons offered by the defendant were not its true reasons," a plaintiff must "show[] that the employer's proffered explanation is unworthy of credence."). Therefore, her FMLA retaliation claim fails.

### C. Plaintiff's Title VII Retaliation Claim

In Count One, Bullock claims that she was terminated for filing complaints of discrimination against Kraft with the EEOC.[14] Bullock's Title VII retaliation claim is

---

[14] Bullock claims in her Amended Complaint that the EEOC right-to-sue letter issued on June 24, 2010 authorized her to file suit against Kraft for both racial discrimination *and*

assessed using the same analytical framework as her FMLA retaliation claim. As the record reveals no direct or indirect evidence of intentional retaliation, Bullock must satisfy the *McDonnell Douglas* "burden-shifting" standard. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996).

In order to establish a prima facie case of retaliation, Bullock must prove three elements: "first, that she engaged in protected activity; second, that an adverse employment action was taken against her; and third, that there was a causal link between the protected activity and the adverse employment action." *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004) (citation omitted). Here, again, it is undisputed that Bullock engaged in protected activity in the form of her various EEOC complaints, and that Kraft took adverse employment action against her. The dispositive issue, therefore, is whether those two elements are causally related. Kraft argues they are not, and the Court agrees.

As in the context of her FMLA retaliation claim, Bullock relies solely upon temporal proximity to draw a causal link between her involvement in protected activity and her termination. In particular, she alleges that she "filed her charge of discrimination on September 8, 2008" (Pl.'s Resp. at 33-34.), only two months before her discharge. This two-month interval is insufficient to establish a causal connection. *Cf. King*, 328 F.3d at 151 n.5; *see Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) ("Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation."). Moreover, Bullock's reliance on the chronological closeness of the two events is belied

---

retaliation. (Pl.'s Am. Compl. ¶¶ 99-101.) In the present action, however, Bullock opted not to proceed on her Title VII discrimination claim, alleging only wrongful retaliation.

by the fact that she also lodged similar charges as early as *two years* before her termination—charges which apparently invited no retaliatory response from Kraft.

Finally, whatever weak inference of causation might be drawn is "eroded" by the lion's share of evidence suggesting that Bullock's failure to comply with the company attendance policy was the actual, and reasonable, cause of Kraft's employment decision.[15] *Cf. Cheshewalla v. Rand & Son Const. Co.*, 415 F.3d 847, 852 (8th Cir. 2005) (holding that, where an employee "missed many days of work and was in fact laid off on a day when she was skipping work," such "intervening events eroded any causal connection suggested by the temporal proximity of [the employee's] protected conduct and her layoff") (internal quotations omitted). Under the facts of this case, Bullock cannot prevail on the basis of temporal proximity alone. Since no reasonable juror could conclude from the evidence presented that Kraft terminated Bullock in retaliation for her engaging in protected activity, summary judgment will be entered in Kraft's favor as to Count One.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion will be granted.

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
United States District Judge

Date: **Nov. 22, 2011**
Richmond, VA

---

[15] Whether the Court examines Bullock's absenteeism under the third element of the prima facie case or as part of Kraft's legitimate justification for its actions, the result is the same.